IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

ev Transportation Services, Inc.,

        Plaintiff,

v.

Michigan Income and Principal-Protected Growth Fund, LP and Advanced Technology Automotive Company, LLC,

        Defendants.

Case No.
Hon.

## COMPLAINT

Plaintiff, ev Transportation Services, Inc. ("EVTS") ("Plaintiff" or "EVTS") through its undersigned counsel, Jaffe, Raitt, Heuer & Weiss, P.C., for its Complaint against Defendants Michigan Income and Principal-Protected Growth Fund, LP, ("MIPP") and Advanced Technology Automotive Company, LLC ("ATAC") (collectively "Defendants"), alleges as follows:

## INTRODUCTION

1.    This action seeks a declaratory judgement that EVTS is the clean title owner of certain registered trademarks and related intellectual property and therefore has not infringed on any enforceable trademark rights of Defendants.

2.    On or about August 6, 2020, EVTS purchased certain intellectual property, including two trademarks and various related intellectual property, from DFW-USA, INC. d/b/a eFleets Technology Corporation ("eFleets").

3. Since that time, EVTS has maintained and utilized the intellectual property it purchased from eFleets.

4. Despite that, MIPP claims that it has superior ownership rights to said intellectual property by virtue of a security interest it claims to hold over various assets of ATAC and has asserted in pleadings before the Oakland County Circuit Court that EVTS is infringing upon ATAC's trademark rights.

5. ATAC, a defunct company, at one point claimed to be the owner of EVTS's intellectual property.

6. However, pursuant to Federal Trademark Law, ATAC never owned EVTS's intellectual property because, among other reasons, it never completed and/or defaulted on an agreement to purchase such intellectual property received and/or failed to record an assignment of such intellectual property pursuant to 15 U.S.C. § 1060(4).

7. Moreover, certain documentary evidence proves that ATAC was in fact never the owner of, nor granted MIPP (and/or any of its privies) any security interest in, EVTS's intellectual property, which MIPP is well aware of, despite its claims to the contrary.

8. Finally, the amount of MIPP's claimed debt from ATAC, which MIPP claims gives MIPP ownership rights, is highly inflated and the real balance is such that MIPP could not enforce any claimed security interest against EVTS's

intellectual property, even if MIPP had a valid one, which it does not.

9. Accordingly, EVTS is entitled to a judgment declaring that it is the sole record owner of the intellectual property it purchased from eFleets, with clean title thereto, free of any claimed liens and/or encumbrances by MIPP (and/or its privies) and that EVTS has not infringed on the trademark rights of any party hereto.

## **PARTIES, JURISDICTION, AND VENUE**

10. EVTS is a Delaware Corporation whose principal place of business is in Brookline, Massachusetts. EVTS markets and sells the "FireFly ESV®" electric vehicle and does business in this District.

11. ATAC is a Michigan limited liability company that no longer operates, whose principal place of business was located at 4200 North Atlantic Boulevard, in Auburn Hills, Michigan, upon information and belief, its individual members are Michigan residents and was a contract manufacturer of electric vehicles doing business in this District.

12. MIPP is a Michigan Limited Partnership, whose principal place of business is in Michigan, upon information and belief, its general partner is a Michigan resident and, pursuant to a series of agreements acted as lender and agent for co-lenders Arctaris Income Fund, LP, Arctaris Royalty Ventures Co-Investment, LP, Arctaris Co-Investment, LP, Pure Plastics, Inc. and MIPP (collectively hereinafter MIPP and the foregoing entities are referred to as "Arctaris"), who

provided certain financing to ATAC.

13. This action is brought pursuant to the Trademark Act of 1946, 15 U.S.C. § 1051 et. seq. and 28 U.S.C. § 2201, the Lanham Act 15 U.S.C. § 1051 et. seq., and accordingly, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

14. There is, upon information and belief also complete diversity of citizenship between the parties, and this action seeks equitable relief.

15. Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

## FACTS

### The Firefly Marks and their History

16. On or about May 17, 2011, the United States Patent and Trademark Office ("PTO") published on the Principal Register the mark "FIREFLY" for use with electric utility vehicles in Class 12, and bearing Registration No. 3,962,861, in favor of Good Earth Energy Conversation, Inc. ("Good Earth"), as owner.

17. On or about October 16, 2012, the PTO published on the Principal Register the mark "FIREFLY ESV" for use with electric utility vehicles in Class 12, and bearing Registration No. 4,225,821, in favor of Good Earth as owner (collectively Registration Nos. 3,962,861 and 4,225,821 are referred to as the "Firefly Marks").

18. On or about April 13, 2015, Good Earth recorded an assignment of the

Firefly Marks to eFleets.

19. From April 13, 2015, until August 21, 2020, eFleets was the continuous holder of the Firefly Marks.

20. On or about July 1, 2017 and October 16, 2018, respectively, eFleets filed with the PTO Combined Declarations of Use and Incontestibility under Sections 8 & 15 of the Trademark Act for the Firefly Marks.

21. The Firefly Marks are, therefore, incontestible under the Trademark Act.

**eFleets Negotiates A JV Agreement with ATAC, which Was Never Completed**

22. In July 2015, eFleets and ATAC negotiated the terms of a Joint Venture Agreement (the "ATAC JV Agreement") for the purposee of constructing and marketing electric vehicles utilizing the Firefly Marks.

23. The ATAC JV Agrement called for, among other things, eFleets' assignment of the Firefly Marks to ATAC in exchange for obtaining certain membership interests in ATAC, payments due to eFleets for expenses and payments due to eFleets in the future upon ATAC obtaining financing.

24. When that occurred, eFleets was to execute an asisgnment and bill of sale of the Firefly Trademarks to ATAC.

25. Although documents were drafted and executed, eFleets and ATAC never agreed upon final and complete terms and agreements were never finalized

because ATAC failed to provide certain missing information called for to complete the ATAC JV Agreement, including exhibits and amounts for the payment of certain expenses to ATAC, which were essential terms upon which the parties needed to agree.

26. Despite numerous requests by eFleets, ATAC never completed the ATAC JV Agreement.

27. However, for a short period of time, despite that the ATAC JV Agreement was never completed, eFleets permitted ATAC to utilize the Firefly Marks, but never executed an assignment and/or bill of sale of the Firefly Marks to ATAC.

28. Shortly after discussion of the ATAC JV Agreement, eFleets/ATAC pivoted from the use of the Firefly Marks and began to market vehicles under the mark "TECFLEET."

29. Thereafter, ATAC obtained financing from Arctaris and then committed numerous breaches of its understandings with eFleets (as reflected by the parties written incomplete agreements) inlcuding but not limiting to failing to make required payments to eFleets, exceeding borrowing limits and otherwise failing to perform.

30. Accordingly, eFleets withdrew any permissions it had given ATAC to utilize the Firefly Marks, terminated all understandings pursuant to the proposed

ATAC JV Agreement and no assignment or bill of sale for the Firefly Marks conveying ownership of them to ATAC was ever excuted by eFleets and/or recorded by ATAC with the PTO.

31. ATAC was notified continuously and at all times, in writing, that the ATAC JV Agreement was incomplete and that ATAC was not the owner of the Firefly Marks.

**ATAC's Loan And Security Agreements With Arctaris**

32. On or about December 31, 2015, Arctaris as lender entered into a series of loan security agreements with ATAC (the "Loan Agreement").

33. Pursuant to the Loan Agreement, Arctaris agreed to loan money to ATAC, Concorde Marine, Inc. and Advanced Composite Technologies, Inc. ("ACT"), two other companies owned by ATAC's principal.

34. All three borrowers were to receive different amounts of funds, pledged different collateral and had different rights and obligations pursuant to the Loan Agreement.

35. As to ATAC alone (not the other borrowers), the Loan Agreement limited ATAC's liability as follows, in Article 2.10, "…ATAC's liability under this Agreement and the other loan documents will be limited to the Maximum Liability Amount."

36. Paragraph 1.2 of the Loan Agreement defines "Maximum Liability

Amount" as

> (a) $500,000; *plus* (b) the from time-to-time unpaid amount of loans, advances and extensions of credit made directly to or for the benefit of ATAC by Agent, Lenders or the other Borrowers in excess of $500,000; *plus* (c) interest on the foregoing amounts from and after to occurrence of an Event of Default at the rate applicable to the Obligations; *plus* (d) all costs and expenses incurred by Lender in collecting the Maximum Liability Amount from ATAC; *minus* (e) provided no event of default has occurred and is continuing, any payments made by ATAC to Agent from ATAC's own assets (as opposed to funds advanced from the other Borrowers), including from proceeds of warrants exercised by the Lenders, *minus* (f) any payments made to Agent by ATAC after the occurrence and during the continuation of an Event of Default if simultaneous with the payment, ATAC notifies Agent in writing that the payment is being made to reduce the Maximum Liability Amount; *minus* (g) any proceeds of ATAC's Collateral received by Agent (net of reasonable costs of liquidation) after the occurrence and during the continuation of an Event of Default.

37. So, pursuant to the Loan Agreement, ATAC's "Maximum Liability" is $500,000 plus any other monies directly received or for the benefit of ATAC, minus payments made to Arctaris, minus the value of any warrants exercised.

38. Along with other collateral, as part of the security for the loan, ATAC provided warrants for stock to Arctaris totaling approximately $890,000 in value (the "Warrants").

39. The Warrants expressly state on their face that any exercise by Arctaris shall reduce the amount of the loan balance due to Arctaris.

40. As used above, the Loan Agreement states that a Default, "…means an

4875-5979-4186

event which, with the giving of notice or passage of time or both, would constitute an Event of Default."

41. The Loan Agreement defines an Event of Default as, "…the occurrence of any of the events set forth in Article 10."

42. Article 10 states that an "Event of Default" occurs upon, "Failure by the Borrowers to pay, **within ten (10) days <u>after receipt of written notice of the default</u>** of any amount due under this Agreement, the Note, or any Loan Document, any principal or interest on the Obligations when due…"

43. After an Event of Default, the Loan Agreement provides Arctaris enforcement rights against certain "Collateral."

44. The Loan Agreement defined Collateral, which includes: (a) all Accounts; (b) all Inventory; (c) all Equipment and Fixtures; (d) all General Intangibles, Payment Intangibles and Intellectual Property…"

45. In turn, the Loan Agreement defines Intellectual Property as follows:

> … patents, patent rights, patent applications, copyrights, works which are the subject matter of copyrights, copyright registrations, trademarks, trade names, trade styles, trademark and service mark applications, and licenses and rights to use any of the foregoing; all extensions, renewals, reissues, divisions, continuations, and continuations in-part of any of the foregoing; all rights to sue for past, present and future infringement of any of the foregoing; inventions, trade secrets, formulae, processes, compounds, drawings, designs, blueprints, surveys, reports, manuals, and operating standards; goodwill; customer and other lists in whatever form maintained; and trade secret rights, copyright rights, rights in works of authorship, and contract

9

rights relating to computer software programs, in whatever form created or maintained…

46. The above definition was further clarified and superseded when Arctaris and ATAC entered into a separate "Intellectual Property Security Agreement" (the "IP Agreement") concurrent with the execution of the Loan Agreement.

47. The IP Agreement defines the nature and extent of Arctaris's Security Interest in Intellectual Property as follows:

> Section 2. **Security Interest.**
>
> (a) **Grant of Security Interest.** As security for the payment and performance of the Obligations, each Debtor hereby grants to the Secured Parties a security interest in and to all of the following property to the extent each Debtor can grant such security interest in each case whether now or hereafter existing or arising or in which each Debtor now has or hereafter owns, acquires or develops an interest and wherever located (collectively, the "Collateral"):
>
> (i) all patents and patent applications, domestic or foreign, all licenses relating to any of the foregoing and all income and royalties with respect to any licenses (including such patents and patent applications as described in Schedule A), all rights to sue for past, present or future infringement thereof, all rights arising therefrom and pertaining thereto and all reissues, divisions, continuations, renewals, extensions and continuations-in-part thereof;
>
> (ii) all United Stated registered copyrights, copyright applications and copyright registrations, including the Debtor's United States registered copyrights and copyright registrations and United States applications for copyright registrations listed in Schedule B to this Security Agreement and all of the Debtor's

4875-5979-4186

copyrights that are not registered in the United States Copyright Office, including, without limitation, derivative works (collectively, the "Copyrights"), any and all license agreements with respect to the Copyrights and any and all royalties, payments and other amounts payable to the Debtor in connection with the Copyrights, together with all renewals and extensions of the Copyrights, all rights to sue for past, present or future infringement of the Copyrights, and all manuscripts, documents, writings, tapes, disks, storage media, computer programs, computer databases, computer flow diagrams, source codes, object codes and all tangible property embodying or incorporating the Copyrights, and all other rights of every kind whatsoever accruing thereunder or pertaining thereto;

(iii) all state (including common law), federal and foreign trademarks, service marks and trade names, and applications for registration of such trademarks, service marks and trade names (but excluding any application to register any trademark, service mark or other mark prior to the filing under applicable law of a verified statement of use (or the equivalent) for such trademark, service mark or other mark to the extent the creation of a security interest therein would void or invalidate such trademark, service mark or other mark), all licenses relating to any of the foregoing and all income and royalties with respect to any licenses (including such trademarks, names and applications as described in Schedule C), whether registered or unregistered and wherever registered, all rights to sue for past, present or future infringement or unconsented
use thereof, all rights arising therefrom and pertaining thereto and all reissues, renewals and thereof; …

48. Accordingly, one must look at Schedules A-C of the IP Agreement to see exactly what IP is secured.

49. Schedules A-C, which were prepared and effective subsequent to the execution of the incomplete ATAC JV Agreement, are very clear what intellectual property ATAC was providing Arctaris a security interest in: "None."

11

4875-5979-4186

50. Each schedule to the IP Agreement clearly states that ATAC <u>did not own any intellectual property</u> at the time the IP Agreement was entered and therefore did not grant Arctaris a security interest in any such intellectual property.

51. The simple fact is that ATAC was not the owner of any registered trademarks at that, or any other time, including the Firefly Marks.

52. Arctaris thus did not ever receive a purported security interest in the Firefly Marks, let alone a valid and enforceable one.

53. Both ATAC and Arctaris are aware that ATAC did not own the Firefly Marks and have confirmed that Arctaris did not obtain a security interest on multiple occasions, to multiple parties, orally and otherwise.

**EVTS Sues ATAC AND Obtains A Judgement**

54. On or about April 22, 2016, EVTS and ATAC entered into an Exclusive Distribution Agreement (the "EDA"), whereby EVTS was to purchase and ATAC was to manufacture the "FireFly ESV®" electric vehicle, an essential services vehicle designed for parking enforcement, security, shipping and delivery and grounds maintenance.

55. At the time, EVTS was led to believe that ATAC was the owner of the Firefly Marks.

56. Numerous disputes arose between the parties regarding design, engineering, production and delivery of the FireFly vehicles by ATAC and monies

allegedly owed by EVTS.

57. Eventually, EVTS paid ATAC $227,948.00 for Firefly vehicles that ATAC never delivered - - ATAC simply kept the money.

58. On or about July 20, 2018, EVTS commenced an action against ATAC in the Oakland County Circuit Court to recover the monies it paid ATAC for the Firefly vehicles ATAC failed to deliver.

59. On June 4, 2019, EVTS obtained a $227,948.00 judgment ("Judgment") against ATAC.

60. The Oakland County Court then issued a restraining order preventing the disposition of any of ATAC's assets and, after ATAC failed to cooperate in post-judgment proceedings, on EVTS's Motion, appointed John Polderman, Esq., as Receiver over ATAC.

61. Mr. Polderman then set about attempting to administer the receivership estate and aid EVTS in the satisfaction of the Judgement.

62. Before Mr. Polderman could do just about anything, Arctaris appeared post-judgment and attempted to stop Mr. Polderman from proceeding, claiming to have a secured interest in <u>all</u> of ATAC's assets as the result of a claimed debt **exceeding $2 million** and sought to have Mr. Polderman discharged because, Arctaris claimed, Mr. Polderman had no assets to administer as the result of the massive amount of Arctaris's claimed debt and secured interest.

13

63. Arctaris claimed, in writing, to EVTS that it holds a valid and enforceable security interest in the Firefly Marks, superior to any claim of EVTS.

64. EVTS began to investigate Arctaris's claimed interests and discovered two things: (1) Arctaris never had any security interest in, and ATAC never owned, the Firefly Marks; and (2) Arctaris's claimed debt from ATAC was grossly inflated such that it could not even enforce a security interest, even if it had one.

**EVTS Purchases the Firefly Marks From eFleets**

65. As EVTS desired to continue marketing and selling vehicles utilizing the Firefly Marks, in or about the Spring and early Summer of 2020, EVTS engaged with eFleets in discussions concerning the sale of the Firefly Marks.

66. Further evidencing that Arctaris knows it has no enforceable security interest in the Firefly Marks and that ATAC never owned them, Arctaris also made inquiries with eFleets about purchasing the Firefly Marks at that time.

67. In fact, Arctaris had multiple conversations with eFleets in the preceding years concerning same.

68. Ultimately, however, eFleets decided to do business with EVTS rather than Arctaris.

69. On or about August 6, 2020, EVTS as buyer and eFleets as Seller, entered into an "Intellectual Property Purchase Agreement," whereby eFleets conveyed to EVTS the Firefly Marks and certain related intellectual property (the

"EV IP") in exchange for payment of $85,000.  A description of the EV IP is attached hereto as Exhibit 1.

70. That transaction was finalized and, on or about August 18, 2020, eFleets executed an assignment of the Firefly Marks to EVTS.

71. On August 21, 2020, EVTS recorded eFleet's assignment of the Firefly Marks to EVTS with the PTO and thus became the record owner of the Firefly Marks pursuant to the Trademark Act.

72. EVTS is thus the sole and undisputed owner of the Firefly Marks.

73. ATAC, by virtue of its claimed security interest in ATAC's assets, disputes EVTS's unencumbered ownership of the EV IP, including the Firefly Marks and an actual justiciable controversy exists between the parties concerning same.

74. Moreover, in recently filed pleadings in Oakland County Circuit Court, Arctaris contends that EVTS is infringing upon ATAC's (and Arctaris's security interest) ownership of the Firefly Marks by its use of them to market vehicles.

75. EVTS denies any infringement and thus an actual justiciable controversy exists between the parties as to whether EVTS has infringed upon any enforceable trademark rights pursuant to the Lanham Act.

**Arctaris's claimed Debt Is Invalid and Overstated**

76. On January 15, 2016, according to a document prepared by Arctaris, ATAC received an initial loan of $495,000 as contemplated by the Loan Agreement.

77.     According to Arctaris, the only other monies ATAC directly received pursuant to the Loan Documents was a second wire of $425,000 on March 31, 2016.

78.     ATAC's bank records show that on April 13, 2016, just 13 days later, ATAC wired that same $425,000, to ATC, its co-borrower.

79.     ATAC's agreement with eFleets did not permit such inter-company transfers without eFleets' approval and when questioned about it by Michael Greenlee, eFleets' CEO, Gilbert Villarreal, ATAC's principal, responded that Arctaris had "made a mistake" and wired the money to the wrong account and those were ATC's monies all along.

80.     Clearly, those monies were not to the benefit of ATAC and should not have counted toward the loan balance, meaning the amount of principle of loan was only $495,000.

81.     Between February of 2016 and December of 2016, ATAC made cash payments to Arctaris totaling $317,077.42.

82.     Arctaris also exercised the Warrants provided by ATAC totaling approximately $850,000.

83.     So, in less than 11 months, Arctaris received back nearly $1.2 million of consideration.

84.     But Arctaris now claims that none of that money counted to reduce ATAC's loan balance, since ATAC was allegedly in default when that consideration

was received.

85. Specifically, Arctaris says, because the loan was "in default" from day one (allegedly) none of the consideration Arctaris received from ATAC "minused" or reduced the amount of liability.

86. In support of its position that the ATAC payments do not count, Arctaris relies on the language in the definition of "Maximum Liability Amount" that states "*minus* (e) provided no event of default has occurred and is continuing, any payments made by ATAC to Agent from ATAC's own assets (as opposed to funds advanced from the other Borrowers), including from proceeds of warrants exercised by the Lenders."

87. But, sub (f) provides, "*minus* (f) any payments made to Agent by **ATAC after the occurrence and during the continuation of an Event of Default**…"

88. Article 10.1 requires a written notice of default and 10 days to cure before an "Event of Default" could occur.

89. Arctaris did not send such a notice until August of 2019 - - years after these repayments were made.

90. Arctaris was thus over-paid on its loan and has no enforceable debt against ATAC and no security to enforce against the EV IP, if it even ever had one.

91. There exists an actual justiciable controversy between the parties as to

4875-5979-4186

whether Arctaris is owed any debts by ATAC that might permit it to have an enforceable security interest against the Firefly Marks and other EV IP, if ATAC ever had any ownership interest in same.

## COUNT I
## DECLARATORY JUDGMENT

92. Plaintiff reasserts and incorporates all prior paragraphs as though fully stated herein.

93. Arctaris claims that ATAC is the owner of the Firefly Marks and related EV IP and that it has a valid and enforceable security interest in same.

94. It is further claimed that EVTS's use of the Firefly Marks is in violation of the Lanham Act.

95. As described in Paragraphs 22 through 91 above, EVTS disputes the existence of both Arctaris's claimed debt and security interest in the Firefly Marks and related EV IP and any claimed ownership of them at ATAC.

96. Indeed, EVTS is the record and true owner of the Firefly Marks and related EV IP pursuant to the Trademark Act, as the only recognized and recorded holder of an assignment of the Firefly Marks recorded with the PTO, which Arctaris disputes.

97. Accordingly, pursuant to the Lanham Act, EVTS cannot be infringing on the trademark rights of any other party by its use of the Firefly IP since it is the record owner of them.

98. Thus, an actual case or controversy and justiciable question exists between the parties such that they are in need of a judicial determination of their respective rights to appropriately govern their conduct in the future.

99. As the result of the facts stated in Paragraphs 21 through 91, EVTS is entitled to a judicial declaration that it is the sole, unencumbered owner of the EV IP, free of any liens or claims by Arctaris and that it has not infringed and/or committed any actionable trademark infringement pursuant to the Lanham Act as the result of its use of the Firefly Marks and/or related EV IP.

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment in its favor and against Defendants pursuant to 28 U.S.C.A. 2201 declaring that EVTS is the sole, unencumbered owner of the EV IP, free of any liens or claims by Arctaris and that EVTS has not committed any actionable trademark infringement pursuant to the Lanham Act by EVTS's use of the Firefly Marks and/or related EV IP, together with any such other and further relief as the Court deems just and proper.

Respectfully submitted,

**JAFFE, RAITT, HEUER & WEISS, P.C.**

Dated: May 4, 2022     By:     /s/ Ethan R. Holtz
Ethan R. Holtz (P71884)
*Attorneys for Plaintiff*
27777 Franklin Rd., Ste. 2500
Southfield, MI 48034
(248) 351-3000
eholtz@jaffelaw.com